**AMOCO PRODUCTION COMPANY, et al.**

v.

**Cecil D. ANDRUS, Secretary of the Interior, et al.**

Civ. A. Nos. 77–3351, 77–3043, 78–1087, 78–1442, 78–1649, 78–2070, 78–2423 and 80–1554.

United States District Court, E. D. Louisiana.

Nov. 27, 1981.

Gene W. Lafitte, William M. Meyers and J. Berry St. John, Jr., Liskow & Lewis, M. Hampton Carver, John McCollam, Gordon, Arata & McCollam, New Orleans, La., Joseph D. Cheavens and Ray H. Berk, Baker & Botts, Houston, Tex., for plaintiffs.

Rebecca A. Donnellan, U. S. Dept. of Justice, Washington D. C., John P. Volz, U. S. Atty., New Orleans, La., for defendants.

## MEMORANDUM OPINION

ROBERT F. COLLINS, District Judge.

These consolidated actions are before the court on plaintiffs' Motion for Summary Judgment. After considering the motions and the briefs and arguments of counsel, it is hereby determined that plaintiffs' Motion for Summary Judgment should be GRANTED.

Jurisdiction of this court is invoked under Section 1333 of the Outer Continental Shelf Lands Act of 1953, 43 U.S.C. §§ 1331–43 (hereinafter referred to as the "OCS Lands Act" or "Act"), which grants original jurisdiction to the United States district courts over cases and controversies arising out of exploration and development operations on the outer continental shelf.

The material facts are undisputed. Most of the facts, if not all, alleged in the complaints are admitted by the defendants in their answers to the complaints.

The plaintiffs are lessees of certain federal oil and gas leases located on the outer continental shelf of the Gulf of Mexico and administered by the Department of the Interior (hereinafter sometimes referred to as the "Department"). As lessees, plaintiffs pay royalties to the United States pursuant to Section 1337 of the OCS Lands Act, which requires "the payment of a royalty of not less than 12½ per centum, in the amount or value of the production saved, removed, or sold from the lease. . . ."

Accordingly, the royalty provisions of the leases executed between the plaintiffs and the Department require the lessees

[t]o pay the lessor a royalty of 16⅔% in the amount or value of production saved, removed, or sold from the leased area. Gas of all kinds (except helium and gas used for purposes or production from and operations upon the leased area or unavoidably lost) is subject to a royalty.

In 1974, acting through the United States Geological Survey who administers certain aspects of the offshore leasing program, the Department issued "Notice[s] to Lessees and Operators of Federal Oil and Gas Leases in the Outer Continental Shelf, Gulf of Mexico" (hereinafter referred to as the "USGS Notices"). USGS Notices require federal oil and gas lessees to pay a royalty on oil and gas which are vented or flared, used in leasehold operations, or unavoidably lost (hereinafter collectively referred to as "Lost and Used Hydrocarbons").

The plaintiffs, individually, pursued administrative appeals of the USGS Notices. The appeals gave rise to three separate decisions by the Department (hereinafter referred to as the "Administrative Decisions"), each of which rejected the lessee's claims and upheld the USGS Notices.[1]

The plaintiffs bring this action in an attempt to set aside the Administrative Decisions upholding the USGS Notices. They contend that the Department's attempt to impose royalty payments on Lost and Used Hydrocarbons is arbitrary and capricious, since the USGS Notices are a reversal of the Department's long-standing policy to exempt from royalty payments Lost and Used Hydrocarbons. The court agrees with the plaintiffs' contention.

## DISCUSSION

The OCS Lands Act requires the payment of royalty of not less than 12½% "in the

---

1. Administrative Decision GS–91–O&G, *Atlantic Richfield Company, et al.,* issued on June 10, 1977, involved the administrative appeals of plaintiffs Atlantic Richfield Company, Cities Service Oil Company, Continental Oil Company, Getty Oil Company and Phillips Petroleum Company. Subsequently, on July 5, 1977, the Department issued its Administrative Decision styled GS–92–O&G, *Amoco Production Company, et al.* This decision related to the administrative appeals of Gulf Oil Corporation, Mobil Oil Corporation, Amoco Production Company,

Kerr-McGee Corporation, and Union Oil Company of California. Finally, on December 8, 1977, the Department issued Administrative Decision GS–97–O&G, *Amerada Hess Corporation, et al.* This Decision related to the administrative appeals of Amerada Hess Corporation, Burmah Oil and Gas Company, Chevron Oil Company, Exxon Company U. S. A., Marathon Oil Company, Shell Oil Company, The Superior Oil Company, Texaco Inc., and The Louisiana Land and Exploration Company.

amount or value of the production saved, removed, or sold from the lease." 43 U.S.C. § 1337. The regulations and the leases issued under the Act contain the same royalty obligation language.

Prior to the issuance of the USGS Notices, the government, as lessor, and all of its lessees have interpreted the above royalty provision as excluding Lost and Used Hydrocarbons from royalty obligations. Accordingly, the Department has never attempted to collect royalties on Lost and Used Hydrocarbons until the issuance of the USGS Notices. "Thus the question for determination is whether requiring plaintiffs ... to [now] pay royalties on this type of oil and gas is arbitrary and capricious." *Marathon Oil Co. v. Andrus*, 452 F.Supp. 548, 551 (D.Wyo.1978). The Administrative Procedure Act, 5 U.S.C.A. §§ 701–706, provides in part: "The reviewing court shall— .... (2) hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.A. § 706.

For 33 years prior to the adoption of the OCS Lands Act, royalties were collected under federal offshore oil and gas leases pursuant to the Mineral Lands Leasing Act of 1920, *as amended*, 41 Stat. 437, 30 U.S.C. § 181 *et seq.* Prior to 1946, Section 17 of the Mineral Lands Leasing Act provided in part:

> such leases to be conditioned upon the payment by the lessee ... of such royalty as may be fixed in the lease, which shall not be less than 12½ per centum in amount or value of the production....

The above royalty provision was uniformly interpreted by the Department as excluding Lost and Used Hydrocarbons from royalty obligations. On August 8, 1946, the above provision was amended to read:

> such royalty as may be fixed in the lease, which shall not be less than 12½ per centum in amount or value of the production removed or sold from the lease....

Act of August 8, 1946, 30 U.S.C. § 181 *et seq.* The Department interpreted the amended royalty provision as excluding Lost and Used Hydrocarbons from royalty payments.

In 1953, Congress adopted the OCS Lands Act which required lessees of federal offshore leases to pay a royalty "in [the] amount or value of the production saved, removed or sold from the lease...." 43 U.S.C. § 1337. The Department adopted the same interpretation of the OCS Act's royalty provision as it had employed for the previous 33 years under the Mineral Lands Leasing Act. Consequently, the Department made no attempt to collect royalties on Lost 'and Used Hydrocarbons under federal offshore leases.

In 1974, however, the Department reversed its consistent and long-standing policy and practice of not collecting royalties on Lost and Used Hydrocarbons under federal onshore and offshore leases. Such change was predicated on an Opinion issued by the Solicitor of the Department on October 4, 1976 (hereinafter referred to as the "Solicitor's Opinion") which provided: "Production, as used in all federal oil and gas leases includes all oil and gas withdrawn from a reservoir." *Solicitor's Opinion* at p. 2.

In reaching the above conclusion, the Solicitor examined the legislative history of the "removed or sold" language found in the royalty provisions of both the OCS Lands Act and Mineral Lands Leasing Act. He concluded that the restrictive language was purposeless and meaningless since he could "find no explanation for the addition of the phrase." This court disagrees with the Solicitor's conclusion.

The legislative history of the Mineral Lands Leasing Act specifically shows that the language "removed or sold" was added to the Act to clarify that royalty could not be collected on Lost and Used Hydrocarbons. Two courts have so held.

In *Gulf Oil Corp. v. Andrus*, 460 F.Supp. 15 (D.Cal.) and *Marathon Oil Company v. Andrus*, 452 F.Supp. 548 (D.Wyo.1978) the courts held that the government could not collect royalty on Lost and Used Hydrocarbons under onshore leases issued pursuant to the Mineral Lands Leasing Act. In so

doing, the courts struck down notices to federal offshore lessees issued by the Department—similar to the notices issued to OCS Lands Act Lessees—and reversed administrative decisions upholding the notices.

In both cases, the plaintiffs questioned the validity of the notices. They contended that the notices were a reversal of the interpretation by the Secretary of the Interior that had been uniformly and consistently understood and applied by all for more than fifty years. In granting plaintiffs' motion for summary judgment, the courts reviewed the legislative history of the Mineral Lands Leasing Act and concluded that the 1946 amendment introducing the "removed and sold" language was intended to guarantee the exclusion of Lost and Used Hydrocarbons from the payment of royalties. This was aptly noted by the court in *Gulf* :

> [T]he court must first decide what Congress intended by the 1946 amendment to Section 17. Although legislative history on the amendment is scanty, plaintiff has uncovered the following remarks made by C. P. Watson, Vice-President of Seaboard Oil Corporation, on August 30, 1945, during Senate Subcommittee hearings on the bill that amended the Mineral Leasing Act (S. 1236):
>
> > For years the Government, under regulations of the Interior Department, has been computing royalty on the basis of sales, or, as we in the industry say, on the "run tickets." Recently, I have been advised that the Interior Department is going to change that practice; that from now on Government lessees must account for and pay royalty not on the basis of the oil and gas removed from the lease, but on the basis of the production at the well.
>
> Hearings on S. 1236 Before the Subcommittee of the Senate Committee on Public Lands and Surveys. 79th Cong. 1st Sess., at 160. Mr. Watson then proposed an amendment to prevent the contemplated change in assessing royalty payments:

> > I would suggest for your consideration, therefore, the addition of the words "removed or sold from said lease" after the word "production" . . .
>
> *Id.* Watson's suggested language was adopted by Congress verbatim. This is persuasive evidence that in enacting the 1946 amendment to Section 17 Congress intended to ensure that royalty would be due only on oil and gas "removed" from the leasehold, not on total oil and gas produced at the well. Since oil and gas used for production purposes on the leasehold where they were initially produced are clearly not "removed" from that leasehold, no royalty should be required by Section 17.
>
> Reinforcing this view of the Congressional intent behind the 1946 amendment is the uncontradicted fact that, during the ensuing 28 years, until the issuance of NTL–4, the Department adhered to its earlier practice of not basing royalty on total production at the well. The court is convinced that Congress in amending Section 17 intended to ratify the Department's earlier interpretation of that section, thereby exempting from royalty payments oil and gas produced from and used on the leasehold for production purposes.
>
> Accordingly, the court finds that the decision by the Department of the Interior to require payment of royalty on oil and gas produced on Gulf's three leaseholds and used there for production purposes is arbitrary and contrary to the law as expressed by Section 17 of the Mineral Leasing Act of 1920, as amended. 30 U.S.C. § 226. As a result, NTL–4 is invalid as applied to plaintiff on the facts of this case. Summary judgment is granted in favor of plaintiff.

As demonstrated by the *Gulf* court, the legislative history of the Mineral Lands Leasing Act evinces congressional intent to exclude Lost and Used Hydrocarbons from royalty obligations. Moreover, the Department's consistent interpretation of the phrase "removed or sold from the lease" as excluding Lost and Used Hydrocarbons from royalty payments has been judicially

sustained as being a reasonable interpretation and one which supports the intention of Congress.

The legislative history of the OCS Lands Act also demonstrates Congress' intent to continue exempting Lost and Used Hydrocarbons from royalty obligations. Acting in the context of the legislative history of the Mineral Lands Leasing Act, the Congress enacted the OCS Lands Act. In attempting to establish a sound leasing policy, the Congress recognized the need for fair leasing provisions incorporating commonly understood commercial terms:

An important element of sound leasing policy is fixing the terms of a fair lease. This is a matter for legislative determination and the committee believes it desirable to give consideration to the terms of leases which have been developed and are in general use in the industry after a long period of trial and error and to the terms of leases granted by the coastal States under which operations in the Continental Shelf have been conducted.

Under commercial leases and under most leases executed by the States on the Continental Shelf, the normal royalty is one-eighth or 12½ percent of the amount of value of the oil or gas produced and saved . . . ."

*H.R. Rep.* No. 2078, 81st Cong., 2d Sess., at 9–10 (1950).

Accordingly, in structuring the royalty provision of the OCS Lands Act, the Congress borrowed the phrase "removed or sold" from the Mineral Lands Leasing Act. It added to this phrase the term "saved", a term commonly used in state and commercial leases.

In deciding to use the phrase "saved, removed or sold" in the royalty provision of the OCS Lands Act, Congress was aware of, and is presumed to have intended that the language be defined consistently with, the long-standing Interior Department interpretation of the "removed or sold" language used in the royalty provision of its predecessor statute. *National Lead Co. v. United States*, 252 U.S. 140, 40 S.Ct. 237, 64 L.Ed. 496 (1920). The law is clear that Congressional re-enactment of a statutory provision which has been consistently interpreted by an administrative agency signifies congressional approval and adoption of that interpretation.

An early example of the application of the congressional re-enactment doctrine is found in *Helvering v. Bliss*, 293 U.S. 144, 55 S.Ct. 17, 79 L.Ed. 246 (1934), which involved a dispute over the proper method to compute the deduction for charitable contributions under the Internal Revenue Code. The Court concluded:

Moreover, from 1923 to 1932 the Commissioner uniformly ruled that the deduction for charitable contributions was to be taken from net income before computation of the tax and hence in whole from ordinary net income. The re-enactment in later Acts of the sections permitting the deduction indicates Congressional approval of this administrative interpretation.

293 U.S. at 151, 55 S.Ct. at 21.

In this instance, there has been implied legislative approval of the pre-1974 interpretation of the OCS Lands Act, since said Act was enacted with an awareness by Congress of the administrative interpretation of the Mineral Lands Leasing Act excluding Lost and Used Hydrocarbons from royalty obligations.

This court is equally guided by the general rule of statutory construction that an interpretation of a statute by the agency charged with its enforcement or implementation should be followed by the courts or at least given great weight. In *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), the rule was stated as follows:

When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings. [citations omitted.] Particularly is this re-

spect due when the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new.'

The rule is also well illustrated by the case of *United States v. Leslie Salt Co.*, 350 U.S. 383, 76 S.Ct. 416, 100 L.Ed. 441 (1956). There, the Internal Revenue Service reversed its position after more than thirty years of exempting certain financing arrangements from a documentary tax placed upon "debentures" and "certificates of indebtedness." In reviewing the case the Supreme Court stated:

There are persuasive reasons for constructing 'debentures' and 'certificates of indebtedness' in accordance with the Treasury's original interpretation of those terms in this statute's altogether comparable predecessors. In *Norwegian Nitrogen Products Co. v. United States*, 288 U.S. 294 [53 S.Ct. 350, 77 L.Ed. 796], Mr. Justice Cardozo said:

'administrative practice, consistent and generally unchallenged, will not be overturned except for very cogent reasons if the scope of the command is indefinite and doubtful.'

Against the Treasury's prior longstanding and consistent administrative interpretation, its more recent *ad hoc* contention as to how the statute should be construed cannot stand. Moreover, that original interpretation has had both express and implied congressional acquiescence, through the 1918 amendment to the statute which has ever since continued in effect, and through Congress having let the administrative interpretation remain undisturbed for so many years.

350 U.S. at 396–397, 76 S.Ct. at 423–24.

Similarly, the *Marathon* court relied upon the rule of contemporaneous construction to strike down the notices requiring royalties to be paid on Lost and Used Hydrocarbons under federal onshore leases:

This Court cannot lose sight of the general rule that, when the executive department charged with the execution of a statute gives a construction to it and acts upon that construction for many years, the Court looks with disfavor upon a change whereby parties who have contracted in good faith under the old construction may be injured by a different interpretation.

\*   \*   \*   \*   \*   \*

The Supreme Court [has] supported the binding effect of such departmental rulings and practices on the grounds that such administrative rulings and practices had become a 'rule of property,' and that this was especially so where the departmental ruling involved in that case was obviously sound.

\*   \*   \*   \*   \*   \*

Applying that principle to the facts of this case, the decisions of the Department of the Interior and the long-standing practices under the Mineral Leasing Acts affect substantial rights in and under federal oil and gas leases, which have been held to be interests in real property, *Boatman v. Andre*, 44 Wyo. 352, 12 P.2d 370 (1932); *Denver Joint Stock Land Bank of Denver v. Dixon*, 57 Wyo. 523, 122 P.2d 842 (1942).

\*   \*   \*   \*   \*   \*

Such interpretations made almost contemporaneously with statute enacted by men charged 'with the responsibility of setting its machinery in motion' are entitled to great weight.

\*   \*   \*   \*   \*   \*

Furthermore, additional weight should be given an administration where, as here, it is of long standing.

452 F.Supp. at 551–552 quoting *United States v. Harrison and Grimshaw Construction Co.*, 305 F.2d 363 (10th Cir. 1962) *cert. denied* 371 U.S. 920, 83 S.Ct. 287, 9 L.Ed. 229, and *Kenneth v. Schmoll*, 482 F.2d 90 (10th Cir. 1973).

As in *Marathon*, the Department of Interior is attempting to reverse its long-standing practice of excluding Lost and Used Hydrocarbons from royalty obligations. A practice which has become a "rule of property" and should be accorded great weight by the courts. This prior long-standing and consistent administrative interpretation

must stand in lieu of the more recent *ad hoc* contention as to how the royalty provision of the OCS Lands Act should be interpreted; especially since to permit such a change would result in injury to the property rights of parties who have contracted in good faith under the old interpretation. Moreover, Congress has both expressly and impliedly acquiesced in the Department's original interpretation of the Mineral Lands Leasing Act's royalty provision through re-enactment of essentially the same royalty provision in the OCS Lands Act, and through allowing the original administrative interpretation to remain undisturbed for so many years. Consequently, the Department in this instance cannot be permitted to change its original interpretation.

Accordingly, the court finds that the decision by the Department to require payment of royalty on Lost and Used Hydrocarbons is arbitrary and capricious, and is therefore contrary to the law as expressed by Section 1337 of the OCS Lands Act. Consequently, the USGS Notices are deemed invalid, and the Administrative Decisions upholding such Notices are dismissed pursuant to § 706 of the Administrative Procedure Act. Summary Judgment is granted in favor of plaintiffs.